Mr. Sellinger. Good morning, Your Honors, and may it please the Court. The District Court erred in denying LSC's new motion for judgment as a matter of law that claims 1 through 7 and 12 through 18 are not invalid under the old sale bar or in the alternative for a new trial. The only evidence of any commercial sale or offer for sale that occurred prior to the critical date was of the finished bottled product. Mr. Sellinger, regarding reduction of practice, is there any evidence on the record that the formula provided or the process by which Ms. Mansouri instructed the first manufacturer and the fourth manufacturer was different in any way? There is, Your Honor, and by your question I take you to mean was there any evidence at all between the first cosmetic technologies and the fourth manufacturer. There is evidence discussed in I think on pages 42 and 43 of our opening brief. Ms. Libby, Libby Laboratories' discussion, Libby Laboratories said you've got a problem. The written evidence is Ms. Mansouri said, okay, well, go ahead and make the change, but please when you run the test do a comparison with what I have now. Frank Cosmetics in the period of December 20 through December 27 or 8 again said maybe what you have works in a laboratory, referring back to cosmetic technology, but it doesn't work in an industrial setting. Was there change? Ultimately, in the end, no, but in the meantime, there were problems, there were issues. Yes, there were problems and issues, but was the process of the formula changed? The process and the formula had experimentation in the interim period because there was criticism. Now, there's nothing in the record one way or another other than the requests to Libby Laboratories to run multiple tests and to Frank Cosmetics to make some changes. These test batches were on the market and continue to be sold, okay? No, Your Honor. There was the only product that was sold was from lot 4822. There is no evidence that any of the test batches were ever offered for sale or sold. There's no evidence that… Yeah, but the bottle stuff was sold. She said she got some complaints, but she continued to sell it after the complaints, supposed complaints, right? It was put into the stream of commerce by her and not recalled, Your Honor. That is correct, for that one set of products from lot 4822. But that begs the question, I submit, of what it was that was in lot 4822. Does that depend on whether we're dealing with in vitro as opposed to in vivo tests? In part, yes, it does. There were a series of errors in the district court's analysis. The first of which I want to mention is when the district court said that, quote, nothing in the record suggests that the in vivo characteristics of the pre-bottled product are unconnected to the in vivo qualities of the bottled product at age 17. Putting aside the burden of proof as to who was to show connection or not, there is test data in the record, it's the only test data, and it affirmatively negates any such correlation. And there's just two pairs of test data that are available in the record. First, the Frank Hose Medics retained samples of lots 4795 and 4796 tested micro-clean, that's A2310. But the cleanser packets from lot 4795 turned out to be contaminated, and that's A2330. So what we have are two clean retained samples, yet one contaminated finished product. Okay, so, but that's the cleanser, and we're dealing here with a lot of lotion, right? We're dealing with the lotion, but bear in mind that the cleanser and the lotion were made in the same facility, the same time, using many of the same chemicals. But not the same formula. Not the same formula. But again, what we're looking at is the issue of whether there's data on correlation or lack of correlation between the in vivo and the in vitro. And we have that data based on the cleanser. And so, while it's possible... There's an argument to make to the jury. You did, presumably, make that argument to the jury. But why does that require that we set aside the jury verdict? Because the district court didn't say something different than, nothing in the record suggests that the in vivo characteristic... I mean, the district court was very clear... We don't care what the district court said. This is de novo review, right? It is, but if we're in de novo review, Your Honor, and we're looking at evidence that are in joint trial exhibits, I submit that the only evidence in the record shows that there is no correlation between the retained sample and the finished product. We've got the two Francosmetics, and then Libby Labs made, and bottled again, two batches of cleanser. All the filled units were contaminated, but the retained sample from one batch was uncontaminated, while the retained sample from the other batch was contaminated. Was the lotion that was in the bottles from lot 4822, it was tested in vitro, wasn't it? Only a retained sample, Your Honor, not a finished product. There was no testing that was done... I understand that. And then the question is whether or not the testing of the retained product or the inference of the final product would be the same. Yes. So the retained product was tested. So the in vitro testing was good enough for Ms. Mansouri to invest the money to move forward, right? She wasn't taking this lotion out in vivo and going to the shopping mall and putting it on people, right? No, she had... She committed her resources to going forward based on the in vitro test. On a specific type of in vitro test, and it was the USP28 day test. And the only in vivo in vitro test that was done on lot 4822, which is in VX1000, was a truncated seven-day challenge test on a subset of... So did the jury hear testimony as to whether you must have challenged the adequacy of that particular in vitro test, right? I'm trying to get at, following up on what the presiding judge was saying, our job here is to look at the evidence that was presented to the jury and to decide if juries can, you know, substantially, can go either way on some factual issue. So I knew that a lot of your worries, like, why should you be using, relying on in vitro instead of in vivo, the jury heard these differences. And it had to have come to the conclusion, the inferences that you draw, like on a chain, remember in law school, you have a chain of inferences. If you back up, you take the verdict, and you back down away from it for inferences, the jury had to infer that whatever in vitro testing was done on 4822 was okay. There had been no challenge. And they had to decide that in vitro testing of just a retained sample, not the whole batch, had to be indicative of what was in the batch. And then they had to make an inference of what was in the batch got in the bottles. Right? And then they had to make the inference that where the bottles actually got sold. So let me go to the premise. I think you need to find, in my mind, sir, to convince me that I shouldn't agree with a jury verdict, and your adversaries are hearing this, you have to take that chain of inferences and break the chain someplace. Well, let me start with this, Your Honor. As a matter of law, because we'll be doing it on the table. Let me start with this. And that is the curveball argument that EBW's lawyer made in closing argument. And the argument was, even if the lotion LSC sold in 1993 was contaminated, and he says, and it wasn't, it still wouldn't save the 516 patents. Quote, actual sales were made, end quote. Quote, an LSC had admitted that its intent all along was to sell a non-contaminated product. Quote, those things combined are more than enough to trigger the on-sale bar. So, Your Honor. Did you object to that? Judge, the answer is there were a series of. Did you object? There was no specific objection to that statement in closing. But, if I may, this follows on a pattern that began when EBW moved for reconsideration of summary judgment on that ground. The judge denied it. During the charge conference, EBW made that very argument. And in response, we tried to get a charge in, charge language in that would help. The judge denied it. Did the court instruct the jury that the on-sale bar applied if there was an intent to sell an uncontaminated product, but it was contaminated? The court did not provide that specific instruction. But the court did not give defense counsel, plaintiff, a hook to say when that argument was made, look, here's the charge, and that doesn't apply. Because it actually has to be the embodiment of the invention, which is sold or offered for sale. So this isn't the kind of situation where the district judge was surprised or kept in... What was offered for sale was not different in formula or process, was it? We don't know, Judge. We don't know exactly what was sold because there's no test on that finished product. All we know is what the documents show. There was one retained sample on the analysis in 93. And then in early 95, there's the truncated seven-day test on the retained sample. And there's nothing other than that that shows. Let me just step back a minute. You're into your rebuttal time. I appreciate that, Your Honor. There is correspondence, and again, it's identified at pages 42 and 43, where Fran Cosmetics admittedly made products that were out of spec, that didn't comply with different obligations. So when I say it's not clear, I think the evidence affirmatively shows Fran Cosmetics was making products that didn't meet the method, didn't meet the process, and admitted as such. And with that, I will reserve the rest of my time. Thank you. Thank you, Mr. Salazar. Mr. Castanheiros? Thank you, Your Honor, and may it please the court. This case comes to this court on appeal after a jury's verdict, finding that both prongs of the FAP test were met by the evidence in this case. And since it was our burden to show that at trial, and since this case has to do with the record, I'll walk you through exactly what evidence there is that supports each of those prongs. Was there a commercial offer for sale? Yes, there was. That's conceded at page 19 of their opening brief and page 5 of their reply brief. Was the commercial offer for sale of the patented invention? Yes, it was. Was the trial on an offer for sale basis or on a sold basis? An offer for sale, actually, is what the jury was charged in what the verdict form says. And A984, quoting Ms. Mansouri, this was an antimicrobial products, but it says products in the transcript. This was an antimicrobial products that we were selling to Baxter. That's what we're offering, an antimicrobial product, not a contaminated product. We were offering that. There's lots more besides that clear testimony from her mouth. A2302, the Frank Cosmetics batches were being made according to that CT formula, which Judge Wallach never changed. A970 is her testimony on it, and A2302-05 is the formula that was provided to Frank Cosmetics. She admitted that that is covered by the 516 patent. That's at A1069. The pack, their ultimately successful contract manufacturer, used the exact same formula to make the lotion that was ultimately, according to Ms. Mansouri, acceptable to her. That's at pages 1045 and 1069. Ultimately, this case on the patent and invention issue comes down to whether or not the jury was entitled to believe all of that evidence, as well as the evidence that the retained sample on Lot 4822 was in fact representative. Isn't that the magic link? Well, that's the magic link. If that didn't exist. If that didn't exist, then I think I'd still win because what was offered was not contaminated. What was offered was antimicrobial. And by the way, the conversation that you had with Mr. Selinger about intent— You seem to be getting back into that argument that if you offer to sell something and it turns out that that's not within the patent, that somehow your intent makes it an on-sale bar. That's a hard argument. Well, Judge Dyke, I think you need to understand the way that intent comes up here. Intent comes up to meet this argument that somehow or another Ms. Mansouri and LSC intended to sell, or I should say offered to sell, excuse me, to use the language of that, offered to sell a contaminated product. Well, of course intent is important in any contractual formation. Judge Clevenger, your opinion for the court in the linear technologies case uses intent as an important consideration to determine not only whether there was an offer, but whether there was a contract. That's all that intent was about here with regard to this record. There's a presumption that people in business intend to obey the law. Is there not? And offering a contaminated product would be a direct violation. It would be truly remarkable then if you take a look at the order sheet as well as the product descriptions which are in the record as part of the declaration that was filed in the patent office with regard to the ultimately abandoned divisional patent, I believe it was a divisional patent. You'll see that the products are numbered 100910 and 100900. In fact, there's a picture of a bottle bearing that very number, and that's what the invoices to Baxter and Paxsus show was actually sold. And all of this took place in December of 1993, well before even by Ms. Mansouri's own testimony, well even well before she claims to have discovered that there was contamination. Now, of course, there was no Judge Clevenger in vivo or in vitro testing of these final products. That's an inference that after a jury trial, my friend on the other side wants you to draw. That's not proper on Rule 50 review. De novo is testing whether or not there's sufficient evidence in the record.  With regard to the ready for patenting prong of the FAP test, there's evidence aplenty that it was ready for patenting either because it was reduced to practice or because the sufficient drawings and directions existed. With regard to the reduction to practice… They're arguing basically that it wasn't reduced to practice because they had doubts as to whether it would work for its intended purpose. And I think the jury was entitled to conclude to the contrary. If you look again at her own testimony at A-967, she's asked this question. So it's October 4, 1993 when all these tests were completed successfully. LST's antimicrobial lotion had been proven to be effective both as an antimicrobial and the preservative system was also in effect and working. Answer, that's correct. And then this court's decisions in cases such as Weatherchem and STX say that when you order a commercial quantity of a product, that is itself evidence that you had confidence that the invention was complete and operative. But even if there hadn't been a reduction to practice, Judge Wallach, you pointed out in your questioning to my friend over here earlier, the spec sheet, the formula, exactly the same. The problem here was it didn't have anything to do with the invention. The problem had to do, according to Ms. Mansouri, with getting a clean lab to manufacture this. That's ordinary artisan sort of stuff. There was no experimental use defense here. This was not an experimental use case. And while I appreciate that there may be some confusion in this court's jurisprudence about where the experimental use defense or element comes in, this is not the case where it matters. I don't think Mr. Selinger covered the instructional issues in his opening, so I will address those if you'd like. But otherwise, I can rely on the briefs for everything else. Thank you, Your Honors. If I may, Judge Wallach, let me – you made the point about an intent to offer contaminated – and let me say, we're talking about contamination in the sense of a product not being effective. We're talking about skin clean, skin cream. We're not talking about contaminated meat. We're not talking about something that's contaminated that turns it into a poison. Ms. Mansouri obviously was trying to sell something not contaminated. Something that, in fact, was the opposite of not contaminated. She was trying to sell – Something that would treat the contamination in some sense.  But the fact that she was – it's still BBW's burden to show that what was sold worked for its intended purpose and met the claim limitation. What link in the chain? What inference do you – where do you break the chain? We know the formula is the same. The formula doesn't change. The problem is making it so it stays in suspension properly and the rest. And you got one retained test, right? Two. Two? One was an analytic that showed the percent of triclosan. And then the other was a truncated seven-day test on two pseudonymous strains. I'm just trying to get in the mind of the jury because I can – you know, you and I both can make the chain and define the links. Jury's reasoning backwards. You got the product and they need to know, so they have to get backward and back, back, back. So what – where do you break that chain of reasoning that the jury had to have come to a conclusion? I break the chain because there is no evidence that allows a lay jury to go from the two in vitro test data points on 4822 to conclude that the finished end product had sufficient triclosan to make it effective to kill microbes on the skin. And that's an argument you were making to the jury. And the adversary was standing up and saying, no, no, no, it's a – in vitro test is as good as an in vivo test. The one they used was not flawed, that a reasonable person can draw the conclusion that the product goes forward in the same formula and it ends up – it comes out of a batch. And counsel likely made that argument. He also – I know he made the argument that it doesn't matter what happened after October 4th, which was a charge issue. I know he made the argument about the curve ball. It doesn't matter if it's contaminated or not. But at the end of the day, as you said, Judge Dyke, there's a de novo review, and the question is, is there sufficient evidence, despite all the arguments that were made on both sides, to allow the jury to leap from the in vitro test data on 4822 to conclude that what was admittedly sold meant to be effective to kill microbes. And I submit, there is not. Thank you, Mr. Selinger. Thank you, Mr. Castaneda. The case is submitted, and that ends our session for today.